## THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| TESHAYLA MOTON, as next friend of DW, a minor, and SHENITA MOTON, individually and as next friend of ZM and MD, minors, | ) ) ) ) ) | Case No. 23-cv-50120 |
| | ) | Honorable Rebecca R. Pallmeyer |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| CITY OF ROCKFORD and OFFICER J. VAZQUEZ, BADGE NO. 0369, | ) ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFFS' RESPONSE MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs Teshayla Moton, as next friend of DW, a minor, and Shenita Moton, individually and as next friend of ZM and MD, minors, by and through their attorney, Peter T. Sadelski of Ed Fox & Associates, Ltd., file this response memorandum in opposition to Defendants City of Rockford and Johnny Vazquez's motion for summary judgment, stating as follows:

## I. INTRODUCTION

Defendant Vazquez violated the law by detaining Plaintiffs Moton DW, ZM, and MD without having reasonable suspicion that they committed any crimes. Moreover, Vazquez unlawfully continued to detain the children after he knew they were not carrying anything and were unarmed. Finally, Vazquez is not entitled to

qualified immunity because it was clearly established that conducting a *Terry* stop under the circumstances was unlawful.

Defendants moved for summary judgment. But for the reasons mentioned above and explained below, the Court should deny Defendants' motion and allow this case to proceed to trial.

## II. LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure requires district courts to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A dispute is genuine "if a reasonable jury could return a verdict for the nonmoving party[.]" *Wayland v. OSF Healthcare Sys.*, 94 F.4th 654, 657 (7th Cir. 2024). "[A] fact is material if it might bear on the outcome of the case." *Id.*

The moving party has the burden of establishing that there is no genuine dispute about any material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The moving party can point to evidence, such as pleadings, depositions, answers to interrogatories, affidavits, admissions on file, and video footage to meet their burden. See *Parkins v. Civ. Constructors of Illinois, Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998); see also *Scott v. Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 1774, 167 L. Ed. 2d 686 (2007).

To defeat summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). It must "present

definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004).

When determining whether a genuine dispute of material fact exists, courts typically construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. See *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). But "when video footage clearly contradicts the nonmovant's claims, [courts] may consider that video footage without favoring the nonmovant." *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018). In other words, courts should view the facts in the light depicted by the video footage. See *Kailin v. Vill. of Gurnee*, 77 F.4th 476, 481 (7th Cir. 2023); see also *Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016).

Ultimately, courts grant summary judgment "[o]nly if no reasonable trier of fact" could find in favor of the nonmoving party. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

## III. STATEMENT OF FACTS

On February 12, 2023, in Rockford, Illinois, three African American children—DW (12-year-old boy), ZM (14-year-old boy), and MD (15-year-old girl)—went to the local convenience store they regularly visit. SOMF ¶¶ 6–8; SOAF ¶ 1. The boys purchased beverages, drank them, and left the convenience store. SOAF ¶ 2. The boys both wore balaclavas with the face openings pulled below or on their chins, leaving their faces unconcealed. SOAF ¶ 3. MD wore a disposable medical mask over her chin and mouth, leaving most of her face unconcealed. Id. The children were unarmed. SOAF ¶ 4.

After exiting the convenience store, the children walked toward Kishwaukee Street, walked across the southbound lanes of Kishwaukee Street, stopped on the median, waited for the northbound traffic to clear, and then DW and ZM raced each other across the northbound lanes into an alley, while MD walked across the northbound lanes into the same alley. SOAF ¶ 5. The children were not carrying anything, the boys' faces were not concealed, most of MD's face was not concealed, and the children were not weaving in and out of traffic. Id. Vazquez saw DW and MD running and MD walking into the alley. SOAF ¶ 6. But Vazquez did not see the children exiting the convenience store, carrying anything, their faces concealed, or weaving in and out of traffic. Id.

Vazquez turned onto 22nd Avenue, then onto 4th Street, before turning into an alley adjacent to the home where ZM and MD lived. SOMF ¶ 16; SOAF ¶ 7. As Vazquez entered the alley, the children were walking toward the house. SOMF ¶ 17; SOAF ¶ 7. Vazquez asked in an authoritative, accusatory, and aggressive tone, "What are you guys doing?" SOMF ¶ 20; SOAF ¶ 8. Without waiting for an answer, he asked, "Where are you guys running from?" Id. MD said that the boys were racing. Id. Vazquez told ZM to take his hands out of his pockets but did not give the same instruction to MD, who also had her hands in her pockets. SOMF ¶ 52; SOAF ¶ 9. At this point, Vazquez no longer believed that the children were armed. SOAF ¶ 10. When asked where they came from, DW immediately said, "The store." SOAF ¶ 11. ZM confirmed. Id.

Vazquez asked where they lived. SOMF ¶ 21; SOAF ¶ 12. MD pointed to the house a few feet away and said, "Right here." SOAF ¶ 12. ZM initially said, "Somewhere over here," but then pointed at the house, explaining that he does not like giving out his address. SOAF ¶ 13. DW, who lived down the street with his mother, first pointed East toward his home. SOAF ¶ 14. DW then pointed to his grandmother's house, which was the house MD and ZM pointed to. Id.

Vazquez asked, "Why are you guys all masked up?" SOAF ¶ 15. But they were not masked up—both boys wore balaclavas with their faces visible, and MD's disposable medical mask only covered her chin and mouth. SOAF ¶ 16. ZM explained that he wears the balaclava to hide his face from kids in the neighborhood who like to fight because he does not like to fight. SOMF ¶ 24. DW said he does not like to fight either. SOMF ¶ 25.

MD started walking toward the house. SOAF ¶ 17. Vazquez yelled, "Hey! Come over here." Id. MD stopped and said she was going to get her mom. SOAF ¶ 18. Vazquez asked where her mom was, and ZM pointed at the house, saying she was inside. SOAF ¶ 19. Vazquez pointed at the Moton house and asked, "This house?" SOAF ¶ 20. Both ZM and DW said, "Yeah." Id. Vazquez said, "Oh, okay," and allowed MD to go inside the house. SOAF ¶ 21. MD then went inside. Id.

Vazquez asked DW for his name, and he provided it. SOAF ¶ 22. Then, Moton—ZM and MD's mother and DW's grandmother—came outside and asked, "What's going on?" SOMF ¶ 27; SOAF ¶23. Vazquez responded, "They were masked up running across Kish," and said he saw them "running down the alley." SOMF ¶

5

29; SOAF ¶ 24. ZM and DW began explaining what happened, but Moton told them to go inside. SOMF ¶ 30; SOAF 25. Vazquez yelled, "No! They are not free to go yet." Moton stopped the boys from going inside. SOMF ¶ 30; SOAF ¶ 26. Vazquez asked DW for his birthday, and DW gave it to him. SOMF ¶ 33; SOAF ¶ 27. Vazquez then asked ZM for his name and birthday, which ZM provided. Id.

Two and a half minutes from the start of the stop, a backup officer arrived. SOAF ¶ 28. Vazquez asked Moton if she was the boys' mother. SOAF ¶ 29. Moton told him that she was ZM's mother and DW's grandmother. Id. Immediately thereafter, Vazquez asked Moton, in an aggressive an authoritative manner, for her name. SOMF ¶ 33; SOAF ¶ 30. Moton provided it. SOAF ¶ 30. Vazquez again stated that the children were "masked up running across the street." SOAF ¶ 31. ZM corrected him, saying he was not masked up because his entire face was visible. Id. DW agreed. Id. Vazquez did not respond. Id.

Within the next minute and a half, three more officers arrived. SOAF ¶ 32. Four minutes into the stop, Vazquez ran DW's name and date of birth through dispatch. SOAF ¶ 33. Five minutes into the stop, MD came back outside. SOAF ¶ 34. Fifteen seconds later, Moton told MD to get her father. Id. MD went back inside. Id. Five minutes and twenty-five seconds into the stop, Vazquez asked one of the backup officers to check ZM's name in the system. SOMF ¶ 38; SOAF ¶ 35. Five minutes and forty-five seconds into the stop, MD came back outside. SOAF ¶ 36. Six minutes into the stop, dispatch reported that DW was "clear with no record." SOAF ¶ 37. Twenty seconds later, the backup officer said ZM was clear. SOAF ¶ 38.

With Moton, DW, ZM, and MD outside, Vazquez said, "Okay, they're all good." SOMF ¶ 43; SOAF ¶ 39. Vazquez admitted that he waited as long as he did to release them to see if the convenience store called 911 to report any crimes. SOAF ¶¶ 37–38. Vazquez and the rest of the police officers left the scene. SOAF ¶ 39. Although Vazquez collected Moton's name and birthday, he never ran her name or birthday through dispatch, searched it in the database himself, or asked any of the backup officers to do so. SOMF ¶ 44; SOAF ¶ 40.

## IV. ARGUMENT

### A. There is a genuine dispute of material fact as to whether Vazquez seized MD and Moton.

A seizure under the Fourth Amendment occurs if "in the totality of the circumstances, a reasonable person would not feel free to disregard the police and move along." *United States v. Howell*, 958 F.3d 589, 597 (7th Cir. 2020) (citing *Fla. v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 2386, 115 L. Ed. 2d 389 (1991). "This can happen one of two ways: the suspect's freedom of movement is restrained either by physical force or by submitting to the assertion of police authority." *United States v. Wilson*, 963 F.3d 701, 703 (7th Cir. 2020). "For the latter, submission is a must; there is no seizure unless the suspect actually submits to police authority." *Id.*

"'Determining whether a seizure has occurred is a highly fact-bound inquiry,' but a number of circumstances may be relevant, including: whether the encounter occurred in a public place or the police moved the person to a private location; whether the officer told the person that he was free to leave; whether the police limited the person's movement via physical touching, restraint, or other coercive conduct; whether the officer informed the person that he was the target of an investigation;

and whether the person was deprived of identification or other vital documents 'without which he could not leave.'" *United States v. Ahmad*, 21 F.4th 475, 479 (7th Cir. 2021) (quoting *United States v. Tyler*, 512 F.3d 405, 410 (7th Cir. 2008) "Other relevant factors include whether there was a 'threatening presence of several officers and a display of weapons' and 'whether the officers' tone of voice was such that their requests would likely be obeyed.'" *Id.* (quoting *United States v. Shields*, 789 F.3d 733, 743 (7th Cir. 2015). And a person's "age, education, and intelligence are factors to be taken into account when determining the voluntariness of submission to a police request." *Irvin v. Kaczmaryn*, 913 F. Supp. 1190, 1197 (N.D. Ill. 1996).

Importantly, when a police officer approaches an individual and asks questions about the person's identity, destination, or activities in a tone that implies compliance is required, a "seizure" occurs, triggering Fourth Amendment scrutiny. See *United States v. McCarthur*, 6 F.3d 1270, 1276 (7th Cir. 1993); see also *United States v. Drayton*, 536 U.S. 194, 204, 122 S. Ct. 2105, 2112, 153 L. Ed. 2d 242 (2002).

For example, in *United States v. Smith*, the Seventh Circuit held that where police officers encountered the plaintiff in an alley, there were multiple officers present, the nature of the questioning was aggressive, and the plaintiff's movement was physically obstructed by the positioning of the officers and their bicycles, the plaintiff was seized for purposes of the Fourth Amendment. 794 F.3d 681, 685 (7th Cir. 2015)

Here, Vazquez stopped his vehicle in an alley, blocking MD's path, which limited her movement. Vazquez then questioned MD about her destination and

8

activities, indicating that she was the target of an investigation. MD complied by answering all of Vazquez's questions. Then, when MD began walking toward her house, Vazquez commanded her not to go inside. MD stopped and waited until Vazquez permitted her to get her mom. Vazquez effectively told MD that she was not free to leave. From the moment Vazquez initiated contact with MD until he let her go inside the house to her mom, his tone of voice was authoritative, accusatory, and aggressive, conveying that compliance was expected and that he suspected she had committed a crime. And MD complied. Also noteworthy is that MD was only fifteen years old at the time.

Because in the totality of the circumstances, a reasonable fifteen-year-old girl would not feel free to disregard the police and move along, and MD submitted to the assertion of police authority, Vazquez seized MD.

Next, MD informed Moton that a police officer was detaining Moton's minor son ZM and minor grandson DW right outside her house in the alley. Moton did what any reasonable person would and went outside to see what was happening. From the moment Moton approached Vazquez, he used an authoritative and aggressive tone with Moton. A few moments later, a backup officer arrived at the scene. Then, Vazquez asked Moton questions regarding her relationship with the boys. He then commanded that she provide him her name and birthday, which she did. Three additional officers arrived at the scene in the next minute and a half. While Moton admitted that the other officers "didn't do anything" and were "looking like why are

9

we even here," the fact that there were five police officers present was threatening *per se*.

Because Vazquez's tone of voice was such that their requests would likely be obeyed, there was a threatening presence of several officers surrounding her, and a reasonable parent and grandparent would not leave when their child and grandchild were being harassed, Vazquez seized Moton.

A reasonable jury could find that Vazquez seized MD and Moton.[1]

**B. There is a genuine dispute of material fact as to whether Vazquez had reasonable suspicion to believe that the children committed a crime.**

"Officers may not lawfully initiate an investigatory stop—often called a *Terry* stop after *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)—unless they have 'reasonable suspicion that a crime occurred.'" *Taylor v. Schwarzhuber*, No. 23-3151, 2025 WL 829598, at *4 (7th Cir. Mar. 17, 2025) (quoting *United States v. Booker*, 579 F.3d 835, 838 (7th Cir. 2009)). "That reasonable suspicion must be based on 'specific and articulable facts' that suggest criminality[.]" *Id.* (quoting *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994)). It cannot be "a mere hunch[.]" *Navarette v. California*, 572 U.S. 393, 397, 134 S.Ct. 1683, 188 L.Ed.2d 680 (2014). "An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 676, 145 L. Ed. 2d 570 (2000).

---

[1] For the same reasons, Vazquez falsely imprisoned Moton and MD.

10

In a recent decision, the Seventh Circuit held that presence in a high-crime area alone did not justify an investigatory stop when a teenager was running down the street with a bag. *Taylor*, No. 23-3151, 2025 WL 829598, at *4 (7th Cir. Mar. 17, 2025).

Here, Defendants' position is that Vazquez had reasonable suspicion to conduct a *Terry* stop on the children because he observed two or maybe three masked individuals with their faces concealed running away from a convenience store known for being the site of criminal activity across a busy roadway while traffic flowed in both directions and into an alley. Dkt. No. 60, p. 7. But most of Defendants' version of the story is a lie.

Indeed, Plaintiffs dispute that the children were masked, that two or three of their faces were concealed, that they ran across the entire street, that all three of them ran at all, that they crossed while traffic was flowing, and that Vazquez observed them exiting the convenience store. That leaves only two undisputed facts: the convenience store was known for being a site of criminal activity, and the boys ran at some point. [2] These two facts could not create reasonable suspicion as a matter of law.

Thus, summary judgment is improper because the two undisputed facts did not create reasonable suspicion that the children committed a crime as a matter of law, and there is a genuine dispute of the rest of the material facts.

---

[2] Plaintiffs do not personally know whether the convenience store is known for being the site of criminal activity.

**C. There is a genuine dispute of material fact as to whether Vazquez unlawfully continued the *Terry* stop.**

A seizure that is lawful at its inception can violate the Fourth Amendment if it continues absent a lawful basis. See *Taylor*, No. 23-3151, 2025 WL 829598, at *8 (7th Cir. Mar. 17, 2025). "The question does not depend on exactly how many minutes the stop lasts. It depends on whether law enforcement has detained the person longer than needed to carry out the investigation that was justified by the reasonable suspicion." *United States v. Lopez*, 907 F.3d 472, 486 (7th Cir. 2018).

For example, in *Lopez*, police officers detained a person after observing him and his brother load paper bags into their garage on a hunch that the paper bags contained drugs. *Id*. at 475. That hunch was wrong. *Id*. Nonetheless, the officers continued to detain the person and obtained his permission to search his house based on a hunch that there would be drugs inside. *Id*. The Seventh Circuit held even if the initial stop was lawful, which it was not, continuing to detain the person after the officers searched the bag and did not find any contraband was unlawful and violated the Fourth Amendment. *Id*. at 486.

Moreover, in *Taylor v. Schwarzhuber*, *No. 21-CV-600-SCD, 2023 WL 1069736 (E.D. Wis. Jan. 27, 2023), aff'd No. 23-3151, 2025 WL 829598, at *8 (7th Cir. Mar. 17, 2025), the Eastern District of Wisconsin applied the *Lopez* decision. In *Taylor*, police officers detained a teenage boy after observing him running across a busy street carrying a bag. *Id*. at *1. Upon looking inside the bag, the officers saw it contained a frozen turkey. *Id*. But they did not release the teenager at that point. *Id*. Instead, they searched his person and then placed him in the back of their police vehicle. They

then ran his name through their database and held him for several minutes to check for warrants, runaway status, or recent robbery reports. *Id*. at *2. The Court held that "[a] jury presented with the evidence could reasonably conclude that the officers should have released [the teenager] immediately after looking inside the bag." Id. at *7.

Here, Vazquez stopped the children. They were not carrying anything. Vazquez then instructed ZM to take his hands out of his pockets. He did. Vazquez did not instruct MD to take her hands out of her pockets. Vazquez admitted that that at this point, he no longer believed that the children possessed any firearms. Nonetheless, Vazquez waited four minutes to run DW's information through dispatch. Vazquez then waited another minute and twenty-five seconds to have another officer run ZM's information on a computer. Vazquez also admitted that he was waiting to see if the convenience store called 911 to report any crimes. Even if the stop was lawful at its inception, continuing the detention was unlawful because Vazquez's investigation should have concluded when he confirmed that the children were unarmed.

In sum, a reasonable jury could find that, even if Vazquez had reasonable suspicion to initiate the stop (which he did not), he unlawfully continued the detention by failing to release the children once he confirmed that they were not carrying anything and were unarmed.

### D. Qualified immunity does not apply.

As mentioned above, the only nondisputed potentially material facts in this briefing are that the convenience store is known for being the site of criminal activity and that, at one point, the boys ran. On the date of this incident—February 12, 2023—

13

it was clearly established law that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Illinois*, 528 U.S. 119, 124, 120 S. Ct. 673, 676, 145 L. Ed. 2d 570 (2000); see also *Taylor*, No. 23-3151, 2025 WL 829598, at *4 (7th Cir. Mar. 17, 2025) (On December 21, 2015, it was clearly established presence in a high-crime area alone did not justify an investigatory stop, when officers saw a teenager running down a street with a bag.). Thus, Vazquez is not entitled to qualified immunity.

## V. CONCLUSION

Defendant Vazquez violated the law by detaining Plaintiffs Moton DW, ZM, and MD without reasonable suspicion. Vazquez unlawfully prolonged the detention of DW and ZM by not releasing them once he no longer believed they were armed. Vazquez is not entitled to qualified immunity because it was clearly established that conducting a *Terry* stop under the circumstances was unlawful.

Dated: April 7, 2025

Respectfully submitted,

*/s/ Peter T. Sadelski*
Peter T. Sadelski
Ed Fox & Associates, Ltd.
118 North Clinton Street, Suite 425
Chicago, Illinois 60661
(312) 345-8877
psadelski@efoxlaw.com
*Attorney for Plaintiffs*