UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TESHAYLA MOTON, as next friend of DW, a minor, and SHENITA MOTON, individually and next friend of ZM and MD, minors,<br><br>    Plaintiffs,<br><br>  v.<br><br>CITY OF ROCKFORD, and OFFICER JOHNNY VAZQUEZ,<br><br>    Defendants. | No.  23 C 50120<br><br>Judge Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

On February 12, 2023, Officer Johnny Vazquez of the City of Rockford Police Department observed three minors (two boys, DW and ZM, and a girl, MD) crossing a state highway wearing face coverings. Suspecting criminal activity, he stopped the minors in a nearby alleyway, which happened to be in front of a house belonging to Plaintiff Shenita Moton—mother to ZM and MD and grandmother to DW. Officer Vazquez asked for DW's and ZM's names and ages, questioned them about the face coverings, and interacted with the family for approximately seven minutes before leaving without making an arrest. Plaintiffs Shenita Moton and Teshayla Moton (DW's guardian) have sued Officer Vazquez and his employer on behalf of Shenita herself and the three minors, alleging that Officer Vazquez's conduct constituted wrongful detention under the Fourth Amendment, unreasonable search under the Fourth Amendment, and false imprisonment under Illinois state law. (*See* Second Am. Compl. (hereinafter "SAC") [34] at 4–5.) Defendants Vazquez and the City of Rockford now move for summary judgment [59], arguing that Officer Vazquez's conduct did not violate the Fourth Amendment and that he is otherwise protected by qualified immunity. For the following reasons, the court grants Defendants' motion with respect to the claims brought on behalf of Shenita Moton and MD, but denies the motion as it relates to the brief detention of DW and ZM.

**BACKGROUND**

I.     **Factual Background**

The court draws the following factual account from the Local Rule 56.1 submissions provided by both parties, including Defendants' Rule 56.1(a) Statement of Facts [61] (hereinafter "DSOF"), Plaintiffs' Amended Rule 56.1(b)(2) Response to DSOF [76], Plaintiffs' Amended Rule 56.1(b)(3) Statement of Additional Facts [77] (hereinafter "Am. PSOAF"), and Defendants' Response to Amended PSOAF [80]. Additionally, the court relies on video taken from three body worn cameras--one from Officer Vazquez ("Vazquez BWC"), two from other officers not named and not parties in this lawsuit--which depict the entire interaction between Officer Vazquez and Plaintiffs. (*See* Pls.' Exs. 4, 5, 6 [79] (digital exhibits).)

On February 12, 2023, Officer Johnny Vazquez was on patrol in a marked police car near the intersection of Illinois Route 251 (also known as "Kishwaukee Street," a state highway) and 22nd Avenue in Rockford, Illinois. (DSOF ¶¶ 6, 8.) As he approached the intersection, driving northbound, Officer Vazquez saw three youths (MD, ZM, and DW)[1] crossing the highway in a southeastern direction—from the direction of a gas station and convenience store located on the west side of highway and towards an alleyway on the east side of the highway. (*Id.* ¶¶ 9, 12.) Vazquez contends the three were running amidst heavy traffic on the highway. (*Id.* ¶¶ 12–13.) Plaintiffs dispute this; they maintain that the three walked from the store across the highway to the median and then waited there for traffic on the east side of the highway to pass before DW and ZM raced across while MD continued to walk. (*See* Pls.' Resp. to DSOF ¶ 13.)[2] Additionally,

---

[1]     At the time of this incident, DW was 12 years old, ZM was 14 years old, and MD was 15 years old. (PSOAD ¶ 1.)

[2]     Officer Vazquez does not note whether the minors had already entered the roadway when he first witnessed them, and it is possible that he saw them only as DW and ZM were racing across the east side of the highway.

2

Vazquez observed that at least two of the three minors were wearing face coverings or masks concealing parts of their faces. (DSOF ¶ 14.)[3]

Officer Vazquez was aware, from interactions and reports from fellow officers, that the store from which he believed the three minors were running had a history of criminal activity, including batteries, thefts, and weapons offenses committed on the property. (*Id*. ¶ 10.) Further, Vazquez had personally been involved in multiple arrests of juveniles fleeing from the store. (*Id*. ¶ 11; Vazquez Aff. [61-5] ¶¶ 14–17.) Believing that the three individuals "may have committed an offense" at the store, Vazquez turned off the highway, onto the street on the other side of the alleyway, and turned into the alley toward the three minors. (DSOF ¶ 16.) As Officer Vazquez exited his patrol car, the three minors continued to approach him. (*Id*. ¶ 18.) Realizing at that moment that the three were minors,[4] Officer Vazquez questioned the three about what they were doing and where they were running from; ZM (the older boy) responded, pointing back towards the store and explaining that they had come from that direction. (*Id*. ¶ 20.) Vazquez then asked the three where they lived. In response, MD pointed to the house where they were standing, while DW and ZM initially gestured in a different direction before clarifying "right here"; ZM explained that he hesitated because he does not like to disclose his home address. (*Id*. ¶ 21; *see* Vazquez BWC at 1:14–20.) MD then began walking towards the house, away from Officer Vazquez, prompting him to tell her "hey, come over here." (Pl.'s Resp. to DSOF ¶ 22; *See* Ex. 6, Vazquez

---

[3] According to Plaintiffs (and confirmed at least in part by the BWC tapes), DW and ZM were wearing balaclavas that were pulled below their chins, while MD was wearing a blue surgical mask. (PSOAF ¶ 3.) Defendants maintain that DW and ZM were wearing coats or hoodies with the hoods up and their faces (above their chin) at least partially concealed. (*See* Defs.' Resp. to PSOAF ¶ 3.)

[4] Officer Vazquez, in his affidavit, states that he learned that the individuals were minors as they removed their face coverings. (Vazquez Aff. ¶ 12.) It should be noted, however, that it is clear in the body-worn footage that both DW and ZM are small in build, the younger DW at least a foot shorter than Officer Vazquez—their stature (in addition to faces) would likely have also informed Officer Vazquez that they were minors. DW's and ZM's faces are uncovered for the entirety of the available footage. (*See* Vazquez BWC at 1:01–1:10.)

BWC at 1:32–1:44.) When MD explained that she was going inside the house to get her mom, Officer Vazquez noted "oh, okay," and allowed MD to do so. (*Id*.)

With MD gone to get her mother (Plaintiff Shenita Moton), Officer Vazquez asked DW to state his name; in his affidavit, Vazquez explains that he did so in order to check that name against a database of potential runaways. (Pls.' Resp. to DSOF ¶ 26, Vazquez Aff. ¶¶ 20–22.) He also asked both boys why they were "masked up," and ZM explained that they wore masks out of concern that someone from his high school would recognize him and try to start a fight. (Pls.' Resp. to DSOF ¶ 24.)

At this point, Plaintiff Shenita Moton exited her house and approached Officer Vazquez and the boys, and asked Officer Vazquez what was going on. (DSOF ¶ 27–28.) Officer Vazquez explained that he observed the boys "masked up running across [Kishwaukee]." (PSOAF ¶ 24.) Moton instructed DW and ZM to go inside, but Officer Vazquez advised that they were not free to leave yet; Moton objected loudly. (DSOF ¶ 30.) Officer Vazquez then asked both boys for their names and dates of birth; both complied. (*Id*. ¶ 33.) Officer Vazquez asked Moton if she was the boys' mother, and she explained that ZM is her son and DW is her grandson. (PSOAF ¶ 29; *see* Vazquez BWC at 3:33–3:37.) As backup officers (a total of four) arrived at the scene, Vazquez asked for Moton's name, birth date, and address, and Moton—now animated and recording the interaction herself—promptly provided her information. (PSOAF ¶ 29; *see* Vazquez BWC at 3:38–4:22.)

A little over four minutes into the encounter, Officer Vazquez used his portable radio to run DW's name and birthdate through the law enforcement database for missing or runaway juveniles. (DSOF ¶ 36; PSOAF ¶ 33.) Vazquez asked a backup officer to run ZM's information through the same database, informing Moton that the boys were not free to leave until their names came back clean. (DSOF ¶ 37–38.) MD, meanwhile, briefly emerged from the house, but Moton instructed her to go back inside and fetch MD's father. (PSOAF ¶ 34.) About six minutes into the stop, Officer Vazquez was informed from his dispatch that DW was "clear with no record," and

4

shortly after was informed by the backup office that ZM was similarly "clear." (PSOAF ¶¶ 37–38.) There had been no 911 call or report of a crime at the store. (*Id*.) Having cleared ZM's and DW's names in the databases, just under seven minutes after stopping them in the alley, Officer Vazquez informed Moton that the name checks returned clear and the boys were free to go; all five officers present promptly left the scene. (DSOF ¶ 43.) During the entire interaction with Plaintiffs, Officer Vazquez made no physical contact with Moton or the minors, nor did he conduct any searches beyond asking the boys to remove their hands from their pockets and remove their balaclavas. He did not run Moton's or MD's names through any record search or database. (DSOF ¶ 44.)

## II. Procedural History

Plaintiffs filed their original complaint [1] on April 11, 2023, asserting § 1983 claims against Officer Vazquez for wrongfully detaining and unreasonably searching Moton, DW, and ZM in violation of the Fourth Amendment, and state law *respondeat superior* claims against the City of Rockford. They filed their Second Amended Complaint on April 3, 2024, adding MD as a plaintiff and asserting that she also was subject to Officer Vazquez's unlawful detention and search. Defendants answered [35] the SAC on May 6, 2024. On January 30, 2025, Defendants moved [59] for summary judgment on all claims. The matter is now fully briefed.

## **LEGAL STANDARD**

"Summary judgment is appropriate if there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law." *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 853 (7th Cir. 2015) (citing FED. R. CIV. P. 56(a)). A genuine issue of material fact exists only if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In reviewing a motion for summary judgment, the court must "consider all of the evidence in the record in the light most favorable to the non-moving party, and [] draw all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Donald v. Wexford Health Sources,*

*Inc.*, 982 F.3d 451, 457 (7th Cir. 2020) (quoting *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018)).

## DISCUSSION

Defendants seek summary judgment on four grounds. First, they argue that summary judgment is warranted for the unlawful detention claims brought on behalf of Shenita Moton and MD because neither Moton nor MD was "seized" under the meaning of the Fourth Amendment. (Defs.' Mem. [60] at 3.) Second, while Defendants do not dispute that ZM and DW were seized, they argue that Officer Vazquez had a reasonable suspicion that ZM and DW had committed a crime, justifying an investigatory stop. (*Id*. at 6.) Third, Defendants maintain that Officer Vazquez did not conduct a "search" in this case, thus summary judgment on Plaintiff's unreasonable search claims is appropriate. (*Id*. at 9.) Fourth, in the alternative, Defendants argue that Officer Vazquez is entitled to qualified immunity because no clearly established law would have informed him that his conduct was unlawful. (*Id*.at 10.) The court discusses each of these arguments in turn.

### I. Seizure of MD and Shenita Moton

To prevail on their claims that Officer Vazquez's conduct constituted a wrongful detention in violation of the Fourth Amendment protections from unreasonable seizures, Plaintiffs must prove that they were subject to a "seizure" under the meaning of the Fourth Amendment. Whether a seizure has occurred under the Fourth Amendment depends on the totality of the circumstances. *See United States v. Ahmad*, 21 F.4th 475, 478–79 (7th Cir. 2021). "A person has been 'seized' within the meaning of the Fourth Amendment . . . only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id*. at 479 (quoting *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988)). This is a "highly-fact bound" inquiry, turning on factors including "whether the encounter occurred in a public place or the police moved the person to a private location; whether the officer told the person that he was free to leave; whether the police limited the person's movement via physical touching, restraint, or other coercive conduct; whether the officer informed the person that he was

the target of an investigation; and whether the person was deprived of . . . vital documents. . . . " *Id*. Where no physical force is used by law enforcement, "submission is a must; there is no seizure unless the suspect actually submits to police authority." *United States v. Wilson*, 963 F.3d 701, 703 (7th Cir. 2020). The court concludes in the circumstances of this case that neither MD nor Shenita Moton were seized by Officer Vazquez.

Beginning with Moton, the facts are undisputed that she exited her house on her own volition, was never told she could not leave, and was not obstructed or touched physically in any way. Officer Vazquez's entire interaction with her took place on a public alleyway. While Plaintiffs argue that Vazquez used "an authoritative and aggressive tone with Moton" that rendered the situation coercive (*see* Pls.' Mem. [68] at 9), the body worn camera footage does not support that conclusion. Indeed, viewing the entire interaction between Moton and Officer Vazquez, it is Moton who uses a (perhaps justifiably) animated and aggravated tone, demanding an explanation for why Officer Vazquez was detaining her son and grandson, while Officer Vazquez calmly attempts to explain his actions as not "racial profiling" and asking for Moton's information. (*See generally* Vazquez BWC at 2:14–6:15.) Moton may have had good reason not to leave her son and grandson alone with Officer Vazquez, but no reasonable person in her shoes would have concluded she was "not free to leave." *Ahmad*, 21 F.4th at 479.

MD presents a closer case because, unlike Moton, MD was initially stopped by Officer Vazquez when he parked his patrol car in the alleyway and asked questions about where she lives and what she, DW, and ZM were doing when running across Kishwaukee Street. But "[a] seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Id*. at 478 (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). Because it is undisputed that Officer Vazquez did not use physical force in restraining MD, moreover, she can only be considered "seized" if she submitted to his authority. *See Wilson*, 963 F.3d at 703. Here, it is undisputed that only twenty seconds into her interaction with Officer Vazquez, MD voluntarily walked away from Officer Vazquez and towards her house; Officer Vazquez initially told her "hey,

7

come over here," but as soon as MD responded that she was getting her mother, Officer Vazquez allowed her to leave and she did not return to the alley for a few minutes—and then only did so voluntarily. (Vazquez BWC at 1:20–1:37.)[5] Officer Vazquez never asked MD for her name and date of birth and did not attempt to run her name through any law enforcement database. Given these circumstances, particularly the fact that MD *did* leave the interaction freely after the initial stop, a reasonable jury could not find that she submitted to Officer Vazquez's authority or was "seized" under the meaning of the Fourth Amendment.

## II. Unlawful Detention of ZM and DW

Defendants do not dispute that ZM and DW were not free to leave and were in fact seized under the meaning of the Fourth Amendment while Officer Vazquez collected their names and ran them through law enforcement databases. Instead, they argue that Officer Vazquez's investigatory stop was supported by reasonable suspicion that a crime had occurred. (Defs. Mem. at 6.) A brief investigatory stop, also known as a *Terry* stop, is constitutional without probable cause only when an officer has a "reasonable suspicion that a crime occurred." *Taylor v. Schwarzhuber*, 132 F.4th 480, 487 (7th Cir. 2025) (citing *Terry v. Ohio*, 392 U.S. 1 (1968).) Reasonable suspicion requires "more than a hunch but less than probable cause," but "[l]aw enforcement must point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the suspicion. *United States v. Olson*, 41 F.4th 792, 800 (7th Cir. 2022) (quotations and alterations omitted). "Whether reasonable suspicion of criminal activity justified a *Terry* stop is a fact-intensive, objective inquiry encompassing the totality of the circumstances known to the officers at the moment of seizure." *Id*.

In considering the totality of circumstances in this case, the court notes guidance from the Supreme Court that an individual's presence in "an area of expected criminal activity" is insufficient, by itself, to support reasonable suspicion. *Illinois v. Wardlow*, 528 U.S. 119, 124

---

[5] Contrast this to when DW and MD attempted to leave the alley, Officer Vazquez sternly told Moton that they were not free to leave. (DSOF ¶ 30.)

(2000). It can, however, be one of the circumstances the court considers in determining whether, under the totality of circumstances, an officer's suspicion of criminal activity was reasonable. *See id*. ("[W]e have previously noted the fact that the stop occurred in a 'high crime area' among the relevant contextual considerations in a *Terry* analysis."). For example, the Seventh Circuit has routinely held *Terry* stops lawful where an officer's reasonable suspicions are supported by an individual's presence in a high-crime area *combined* with the individual's flight upon seeing the police (*see, e.g.*, *United States v. Richmond*, 924 F.3d 404, 411 (7th Cir. 2019)), nervous and evasive behavior (*see, e.g.*, *United States v. Oglesby*, 597 F.3d 891, 894–95 (7th Cir. 2010)), meeting the description of someone involved in a reported crime (*see United States v. Washington*, 497 F. App'x 647, 650 (7th Cir. 2012)), or all of the above (*see United States v. Adair*, 925 F.3d 931, 935–37 (7th Cir. 2019)).

Taking this guidance from the Supreme Court and Seventh Circuit, and viewing the facts in the light most favorable to Plaintiffs, a reasonable jury could find that Officer Vazquez lacked a reasonable basis for detaining these minors. The relevant circumstances were as follows: (1) Officer Vazquez observed ZM and DW racing eastbound across Kishwaukee Street, (2) they were coming from the direction of a "high-crime" store (but were not seen at or around the store), (3) Officer Vazquez observed the two wearing some kind of masks or face coverings, (4) Officer Vazquez was not previously alerted of any crime occurring that day at the store, (5) the boys did not flee from Officer Vazquez but walked calmly towards him. *See generally supra* pp. 2–3. Two of these circumstances remain disputed: whether there was traffic on Kishwaukee Street when the boys raced across it, and whether ZM and DW's faces were concealed. (*See* Pls.' Resp. to DSOF 13–14.) Defendants maintain that traffic was flowing when the boys raced across the roadway, and that they "wore masks that concealed their faces"—circumstances that could, potentially, suggest suspicious activity. (Defs.' Mem. at 7.) Plaintiffs dispute this and counter that the boys waited for traffic to pass before running across, and that their faces were exposed the whole time. (Pls.' Mem. at 11.) The available body worn camera footage, for its part, does not

9

depict the DW and ZM crossing the street, but does show that when Officer Vazquez first approached the minors, the boys' faces were not covered by their balaclavas (save for ZM's chin below his mouth). (*See* Vazquez BWC at 1:01.) At summary judgment, the court resolves these disputes in Plaintiffs' favor; a reasonable jury could easily find that racing across a clear roadway and wearing a balaclava in February with faces exposed are not indicative of criminal activity.

Of the remaining circumstances noted by the court, the only undisputed fact that weighs in favor Officer Vazquez's suspicion that ZM and DW had committed a crime is the fact that were running in the opposite direction of a "high-crime" location—but this is exactly the circumstance that, without supporting circumstances, cannot be a standalone basis for reasonable suspicion. *See Wardlow*, 528 U.S. at 124.

Moreover, even assuming that Officer Vazquez perceived (even mistakenly) that DW and ZM were fully masked and weaving through traffic and had reasonable suspicion to stop them in the alleyway, reasonable suspicion does not justify an investigatory stop indefinitely. "A *Terry* stop may last no longer than is necessary to effectuate its purpose." *United States v. Lopez*, 907 F.3d 472, 486 (7th Cir. 2018) (quotation omitted). An individual detained in a *Terry* stop "must be released as soon as the officers have assured themselves that no skullduggery is afoot." *Id*. (quoting *United States v. Childs*, 277 F.3d 947, 952 (7th Cir. 2002) (en banc)). There was no obvious "skullduggery" here: Both boys responded promptly and without evasion or hostility to Officer Vazquez's questions. A reasonable jury could find that upon approaching DW and ZM, recognizing they were minors, noting that they did not flee or evade questions, and observing no weapons or visible objects in their hands or pockets, Officer Vazquez no longer had a reasonable suspicion that the boys had committed a crime at the store. Indeed, Officer Vazquez's actions betray a lack of suspicion of DW and ZM—upon approaching them and asking what they were doing, he did not conduct any search of their person or question what they were doing at the store; he took their names only to check in a database for runaway and missing juveniles, and released the boys as soon as those checks returned clear. (Vazquez Aff. ¶¶ 20–21, 26.) A

reasonable jury could conclude that, at this point, Officer Vazquez's suspicions had shifted from suspecting the boys had committed an offense at the store to suspecting the boys were runaways[6]—in other words, not an imminent or completed crime.

Defendants attempt to justify the length of the stop in two ways. First, they argue that the length of the interaction itself—"less than 7 minutes"—was not unreasonable for taking the boys' information and running a name check. (Defs.' Mem. at 8–9.) But Defendants' reliance on the perceived brevity of the stop is misplaced, as even "a 15-minute stop would be too long if the investigation justifying the stop finished at the 14-minute mark." *Lopez*, 907 F.3d at 486; *see also Taylor*, 132 F.4th at 493 ("Even one second of continued detention after an unlawful stop is too long."). The question is whether Officer Vazquez's detainment of ZM and DW was "longer than needed to carry out the investigation that was justified by the reasonable suspicion." *Lopez*, 907 F.3d at 486. If Officer Vazquez's suspicions of ZM and DW were, or should have been, extinguished upon approaching and interacting with them, then he lacked justification to declare them "not free to leave" five minutes later. *See supra* p. 4.

Alternatively, Defendants cite *Hall v. City of Chicago*, 953 F.3d 945 (7th Cir. 2020), for the statement that a name check in a law enforcement database is "permissible without separate reasonable suspicion that an individual has an outstanding warrant against him, as long as that delay is reasonable." *Hall*, 953 F.3d at 953. They further cite the case for the holding that "[n]o reasonable jury could find that [a four-to-seven minute to run a name check] delay is objectively unreasonable." *Id.* at 954. Defendants interpret these quotes to mean that a seven-minute extension of a *Terry* stop, for the purpose of running a name check, does not unreasonably delay the stop beyond what is longer than needed. (*See* Defs.' Reply [81] at 11.) But Defendants misunderstand the question at issue in *Hall*. In that case, plaintiffs were routinely subjected to

---

[6] Officer Vazquez does not explain his basis for suspecting the boys were potentially runaways or missing, or why he continued to suspect this after once Shenita Moton exited her house and identified ZM as her son and DW as her grandson. Yet that information evidently was enough to satisfy Defendant that MD was not a runaway.

11

*Terry* stops by officers for suspected violations of the local panhandling ordinance, during which officers would routinely run warrant checks. *Hall*, 953 F.3d at 949. Without contesting the *Terry* stops themselves, plaintiffs alleged that the warrant checks unconstitutionally delayed the stops (by four to seven minutes) because a general warrant check requires "more than reasonable suspicion" that an individual was violating the panhandling statute; they argued that, in addition, the officers needed "individualized suspicion . . . such as that the person detained is wanted on a warrant." *Id*. at 952. The Seventh Circuit rejected the argument, holding that a separate, individualized suspicion of an outstanding warrant is not necessary where there is reasonable suspicion to stop in the first place, and the warrant check does not cause an unreasonable delay. *Id*. at 953. *Hall* does not stand for the proposition that Defendants seem to make here, that an officer may extend a stop after *the initial reasonable suspicion has evaporated* to perform an unrelated name check.

In short, many of the critical factual circumstances of Officer Vazquez's first impression of DW and ZM—how they were wearing their balaclavas, if they were waiting for traffic to pass—remain in dispute. Resolving them in favor of Plaintiffs, a reasonable jury could find that Officer Vazquez's suspicions were not reasonable or otherwise were fully resolved well before he ended the *Terry* stop. Either finding would support a claim of wrongful detention under the Fourth Amendment.

### III. Unreasonable Search Claims

Defendants argue that Plaintiffs have failed to meet the basic elements of an unreasonable search claim as there is no evidence that any of the Plaintiffs were, in fact, searched. (Defs.' Mem. at 9–10.) A "search," under the meaning of the Fourth Amendment, "occurs either when the government physically intrudes without consent upon a constitutionally protected area in order to obtain information, or when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Tuggle*, 4 F.4th 505, 512 (7th Cir. 2021), quoting *United States v. Thompson*, 811 F.3d 944, 948 (7th Cir. 2016).

This argument is well taken. Plaintiffs have failed to develop any triable "unreasonable search" claim. It is undisputed that Officer Vazquez never entered Plaintiffs' property, touched any individual's person or property, or sought information beyond voluntarily-provided names and birth dates. Indeed, the only allegation of any "search" in the SAC is the allegation that "Defendant Vazquez violated DW and ZM's Constitutional rights by searching their persons without just cause"—an allegation directly refuted by the body worn camera footage. (SAC ¶ 40.) Plaintiffs' memorandum in opposition to summary judgment does not respond to this argument for summary judgment (or even mention the phrase "unreasonable search") further confirming that summary judgment on Count II is appropriate.

## IV. Qualified Immunity

Finally, Defendants argue that even if Officer Vazquez's conduct violated the Fourth Amendment, he is protected by qualified immunity. "Qualified immunity shields federal and state officials from monetary liability unless the law they ostensibly violated was clearly established at the time of the alleged offense." *Taylor*, 132 F.4th at 486. Though an affirmative defense, the plaintiff bears the burden at summary judgment of overcoming qualified immunity by showing "(1) there is a dispute of material fact as to whether the office[er] violated a 'statutory or constitutional right,' and (2) the right was 'clearly established at the time' of the challenged conduct." *Id*. (citing *Gupta v. Melloh*, 19 F.4th 990, 1000 (7th Cir. 2021)). As discussed *supra*, there exists a dispute of material fact as to whether Officer Vazquez had a reasonable suspicion to stop ZM and DW as required by the Fourth Amendment, but the question remains whether "clearly established" law established Officer Vazquez lacked reasonable suspicion. A right is "clearly established" if "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Gupta*, 19 F.4th at 1000 (quotations omitted). At summary judgment, the court construes the facts in the light most favorable to Plaintiffs, and asks whether "[Seventh Circuit] precedent and Supreme Court precedent demonstrate that these facts are insufficient to create reasonable suspicion." *See Taylor*, 132 F.4th at 487.

13

*Taylor v. Schwarzhuber*, 132 F.4th 480 (7th Cir. 2025) is particularly instructive here. *Taylor* holds that, as of February 2023, it was "clearly established" law that an individual running in a high-crime area does not create reasonable suspicion. *Taylor*, 132 F.4th at 487. The case arose from an incident on December 21, 2014, when two officers observed plaintiff Isaiah Taylor running with an unidentified object in an area "which had seen a spate of juvenile armed robberies." *Id*. at 484. The officers conducted a *Terry* stop of Taylor, then 16 years old. *Id*. Taylor sued the officers under § 1983 for initiating the stop without reasonable suspicion, and for delaying the stop by frisking him even after learning the "unidentified object" was a Christmas turkey. *Id*. at 485. The trial court concluded that Taylor had not shown that the initial stop violated any clearly established law, but denied summary judgment in favor of the officers on plaintiff's challenge to the subsequent frisk. *Id*. at 485–86.

As to the first holding, the Seventh Circuit vacated the district court's grant of summary judgment, holding that the *Terry* stop violated precedent that was clearly established as of December 2015. *See id*. at 489. In reaching this conclusion, the court found that after "tak[ing] out the disputed material facts" and "tak[ing] Taylor's account to be true, the only basis for the stop was that Taylor was (1) running (2) with a bag (3) in a high crime area." *Id*. at 487. The court then discussed a series of Circuit and Supreme Court precedents concluding that these facts did not create reasonable suspicion. First, the court noted the case of *Gentry v. Sevier*, 597 F.3d 838 (7th Cir. 2010), where the court reversed a determination that police had reasonable suspicion to stop where an individual "trotting" through a residential area at 2:30 in the morning with a wheelbarrow, who did not flee upon the police approach. *Gentry*, 597 F.3d at 846. *Gentry* supports the conclusion that movement through a public space, with a container, does not support reasonable suspicion. *See Taylor*, 132 F.4th at 487–88. *Taylor* court continued by reviewing a substantial line of cases holding that an individual's presence in a high-crime area, alone, also does not create reasonable suspicion. *Id*. at 488–89 (discussing cases). Taken together, *Gentry*

14

and the Seventh Circuit's post-*Wardlow* precedent establish that movement in a high crime area with an unidentified object does not support reasonable suspicion. *Id*.

The Seventh Circuit's decision in *Taylor* post-dates the interaction between Officer Vazquez and minors, so *Taylor* itself does not constitute "clearly established precedent" for purposes of this case. Nonetheless, *Taylor*'s holding confirms what was reasonably established in December 2015 (the time of Taylor's arrest, and before the relevant events here) and applies with equal, if not more, force to the facts here. As noted above, the only undisputed facts supporting Officer Vazquez's *Terry* stop were that ZM and DW were running in a high crime area. If *Taylor* stands for the holding that "(1) running (2) with a bag (3) in a high crime area" did not create reasonable suspicion under clearly established law as of December 2015, it also holds, *a fortiori*, that (1) running (2) *without* a bag (3) in a high crime area did not create a reasonable suspicion under clearly established law as of February 2023.[7]

---

[7] Defendants' attempts to factually distinguish *Taylor* are unpersuasive. First, they note that, in *Taylor*, the officers frisked the plaintiff and detained him after reasonable suspicion had dissipated, while Officer Vazquez conducted no frisk in this case. (*See* Reply at 9.) But Defendants forget that *Taylor* involved two distinct Fourth Amendment claims—one arising from the initial stop, a second arising from the post-turkey discovery frisk. *See Taylor*, 132 F.4th at 485–86. The Seventh Circuit did not disturb the district court's denial of summary judgment for defendants on the frisk claim (it was not on appeal), and thus the entire opinion concerns the reasonable suspicion justifying the initial stop—factual distinctions arising once the officers began investigating Taylor are not relevant to its application here. Defendants also attempt to distinguish this case by noting that ZM and DW "had their faces concealed," but, again, this is a matter of disputed fact and not relevant distinction for a ruling on summary judgment.

## CONCLUSION

Defendants' motion for summary judgment [59] is granted in part and denied in part. It is granted with respect to Count I on behalf of Shenita Moton and MD and Count II in its entirety. It is denied with respect to Count I as it relates to DW and ZM, and as to Count III.[8]

ENTER:

Dated: August 26, 2025

REBECCA R. PALLMEYER
United States District Judge

---

[8] Defendants' only argument for summary judgment on Count III was that "[w]ithout liability by Officer Vazquez, the City of Rockford is entitled to summary judgment on Plaintiffs' *respondeat superior* claim." (Defs.' Mem. at 13.) Because the court holds that at least some of Plaintiffs' claims against Officer Vazquez may proceed, it need not discuss this argument.